IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TERRENCE ISSAC**,                              Case No. 1:16 CV 1345

      Plaintiff,

      v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                          MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Terrence Isaac ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction pursuant to 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in March 2013, alleging a disability onset date of September 11, 2012. (Tr. 171-89). His claims were denied initially and upon reconsideration. (Tr. 118-24, 130-41). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 142). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on February 4, 2015. (Tr. 33-63). On May 20, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 17-27). The Appeals Council denied Plaintiff's request for review. (Tr. 1-6). Plaintiff then filed the instant action on June 3, 2016. (Doc. 1).

## FACTUAL BACKGROUND[1]

### *Personal Background and Testimony*

Plaintiff was born in November 1961 (Tr. 64) and had a high school education and four years of college (Tr. 58). He had past work as a public works janitor, construction laborer, mail clerk, and recording clerk. (Tr. 57-58); *see also* Tr. 39-43 (Plaintiff's testimony about his past work). He lived with his mother and grandmother. (Tr. 48).

Plaintiff testified that in 2012, the "severity of [his] daily back pain increased tremendously." (Tr. 43). He described his problems as "90 percent" back and "ten percent" shoulder related. (Tr. 43-44). Also in 2012, he noticed numbness in his legs and pain in the bottom of his feet upon waking. (Tr. 44). Additionally, he felt "constant aching" that would radiate to his hips. *Id.* His pain level was a "constant six" out of ten, with good days and bad days. (Tr. 45). On bad days, he went to the ER to get a "pain injection of Toradol." *Id.* In a good week, he had "one or two good days". (Tr. 46). On bad days, he just laid in his bed, took medication, and did some home exercises. *Id.*

He testified he spent 90 percent of his day "basically laying [sic] in bed with a pillow in between [his] knees." (Tr. 44); *see also* Tr. 48 (explaining that between 6:00 a.m. and 10:00 p.m. "other than going down to cooking [sic] breakfast and coming down and getting dinner, and occasionally going down and checking messages on the computer, 85 percent of that time is spent in my bed."). He did his own laundry, cooked his own breakfast, and could vacuum for about fifteen minutes. (Tr. 47-48).

---

1. The undersigned here summarizes only the evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief are waived). The undersigned will address the additional records submitted to the Appeals Council in that section of the opinion.

Plaintiff had tried nerve block injections and "another pain injection procedure" with no relief. (Tr. 44). He was still undergoing physical therapy, and had just stopped in November 2014 "based on the number of visits you're allowed per calendar." (Tr. 45). He was starting again at the time of the hearing. *Id.* He testified that in the past, he would "feel a little better" after leaving physical therapy, but the next day would be "back to where [he] started." (Tr. 51-52). Plaintiff also testified he was taking Naproxen, Flexeril, Diclofenac, and anti-inflammatories. (Tr. 54).

Plaintiff estimated that if he "push[ed] [him]self", he could stand for 35 to 40 minutes. (Tr. 49). However, he would then need to go lay down. *Id.* He estimated on a good day, if he "push[ed] [him]self", he could sit for an hour to an hour-and-a half at one time, but on a normal day, it would be more like 30 to 35 minutes before he "start[ed] feeling some tingling in [his] legs." *Id.*

Regarding his shoulder, Plaintiff testified that he had a joint replacement in his right shoulder in 2005 and lost 25 to 30 percent of the range of motion. (Tr. 50). The shoulder still caused him pain, "[d]epend[ing] on which way [he] move[s] it, or if [he] catch[es] it." *Id.*

**Medical Evidence**

*Treatment Evidence*

Prior to his alleged onset date, Plaintiff underwent a repair of a torn bicep in 2003 (Tr. 356), a shoulder replacement in 2005 (Tr. 356-57) and had a laminectomy (back surgery) in 2007 (Tr. 680, 843); *see also* Tr. 680 (listing "2003 [s]houlder surgery", "2005 [s]houlder surgery", and "2007 [b]ack surgery").

In May 2012, Plaintiff saw Jerold P. Gurley, M.D., complaining of increased back, bilateral gluteal, and bilateral proximal posterior thigh pain. (Tr. 338). Plaintiff reported his symptoms were increased with activity, and not improved with rest or activity modification. *Id.* Dr. Gurley's impression was status post lumbar decompression right L4-5; lumbar spondylosis at L2-3, L3-4,

L4-5, and L5-S1; recurrent lumbago; and recurrent bilateral radiculopathy. (Tr. 339). Dr. Gurley found Plaintiff's "sensory exam [was] diminished to light touch in the left L4 distribution" and that his "[s]traight leg raising [was] positive on the right". *Id.*

A June 2012 MRI of Plaintiff's lumbar spine showed disc space narrowing at L2-3, L3-4, and L4-5. (Tr. 319). It also showed levoscoliosis; degeneration of the discs from L2-3 to L5-S1; retrolisthesis, disc herniation and bulge; nerve root impingement; foraminal narrowing; and reactive marrow changes. *Id.* When compared to a September 2011 study, "the reactive marrow changes at L5-S1 ha[d] progressed" but "[o]therwise there [was] not much interval change in the multilevel disc disease." *Id.*

Plaintiff returned to Dr. Gurley in June 2012 to review his MRI. (Tr. 337). Dr. Gurley noted Plaintiff's "surgical goals ha[d] been met and maintained at the L4-5 level", but he had "mechanical back pain symptoms and functional limitations [that] do correlate with fairly advance lumbar spondylosis at 4/5 lumbar disc segments." *Id.* Dr. Gurley noted surgery was not indicated and referred Plaintiff to pain management. *Id.*

The following week, Plaintiff saw Abdallah Kabbara, M.D., for pain management of his "chronic back pain". (Tr. 324-25). Plaintiff reported his 2007 laminectomy at L4-L5, which gave him "some pain relief." (Tr. 324). He reported pain that was ten out of ten, aggravated by walking, sitting, and lifting. *Id.* The pain was localized in his lower back, and radiated toward both hips. *Id.* The pain was improved somewhat by medication. *Id.* Dr. Kabbara found tenderness on palpation of the lumbar spine "mildly around the right side of the facet joint." (Tr. 324-25). Dr. Kabbara's impression was "multilevel spondylosis, lumbar degenerative disk disease, post laminectomy syndrome and multilevel lumbar disk displacement and multilevel lumbar spondylolisthesis." (Tr. 325).

On July 6, and July 27, 2012, Plaintiff received bilateral steroid injections at L4. (Tr. 322-23).

X-rays of Plaintiff's right shoulder in April 2013 showed "postoperative changes" and "degenerative changes" including "narrowing of the glenohumeral joint with associated osteophyte formation" and "mild widening of the right acromioclavicular joint." (Tr. 361).

X-rays of Plaintiff's lumbar spine in April 2013 showed "[m]ild levoscoliosis, "[m]ild straightening of the normal lordotic curvature"; and "degenerative changes". (Tr. 363). These x-rays showed "disk space narrowing at the L2-L3, L4-L5 and L5-S1 levels"; "[anterior osteophytes and lateral osteophytes"; "[s]mall osteophytes . . . present at L3-L4 and L4-5"; [m]ild degenerative changes of the sacroiliac joints bilaterally"; and "multiple pelvic calcifications possibly indicating phleboliths." *Id.*

In July 2013, Plaintiff saw Daniel Malkamaki, M.D., in the department of physical medicine and rehabilitation, to address his back pain. (Tr. 494-99). Plaintiff complained of pain "localized in the lumbar region" which radiated to both legs. (Tr. 494). The pain was aggravated by bending, standing, walking and sitting, and was relieved by medication, rest, and changing position. (Tr. 494-95). On examination, Plaintiff had pain on palpation "over the L/S junction, mostly bilaterally, with mild paraspinal hypertonicity." (Tr. 497). His lumbosacral range of motion was limited to 95 degrees of forward flexion and 25 degrees of extension "with recreation of pain in flexion." *Id.* Dr. Malkamaki's impression was "[l]umbar discogenic pain with some early spondylosis based on the MRI, with clinical evidence of bilateral LE referral symptoms." *Id.* Dr. Malkamaki ordered "the EPIC injection" and noted he would consider "transforaminal epidural steroid injections" in the future. *Id.* He suggested a home exercise program, noting "[h]e needs to

work on [his] exercises 5 days a week, BID, diligently, to experience long term benefit." *Id.* Dr. Malkamaki also noted he would consider formal physical therapy in the future. *Id.*

Plaintiff returned to Dr. Malkamaki in September 2013. (Tr. 590-94). He reported "feeling worse, because he was trying to get up onto the home exercises, but he was walking a lot at a festival and got worsening aggravation." (Tr. 590). He also reported "other aggravations just with doing light-ish yard work for his mom". *Id.* Dr. Malkamaki noted similar physical findings to his previous exam, and maintained the same plan. (Tr. 592). He started Plaintiff on a "[t]rial of neu[r]ontin, and voltaren." *Id.*

At a visit with a different provider in November 2013, Plaintiff reported he had tried Neurontin "without much relief." (Tr. 610).

In March 2014, Plaintiff reported to Dr. Kutalba Tabbaa that he had low back pain for three years, and noted "occasional numbness of his leg intermittently throughout the day. (Tr. 706). He reported he had tried injections, heat, and ice, with "minimal relief." *Id.* His pain was "worse with walking/activities". *Id.* Plaintiff had a "[n]ormal neurological exam but for LBP tenderness and decrease[d] ROM." *Id.* Dr. Tabbaa ordered a lumbar spine x-ray, suggested "[p]ool therapy next month once his insurance changes; cont[inue] home exercises", and scheduled Plaintiff for a medial branch block. (Tr. 707). A lumbar spine x-ray that same day showed "severe degenerative disc disease and degenerative joint disease worst at L4-5 and L5-S1 but [e]xtend[ing] to L1." *Id.*; Tr. 710-11.

Later in March 2014, Plaintiff underwent a bilateral L3, L4, and L5 lumbar medial branch block. (Tr. 714).

In May 2014, Plaintiff had a lumbar back MRI which revealed diffuse disc bulge at L5-S1, L4-5, L3-4, and L2-3. (Tr. 685). This resulted in mild central canal stenosis at L4-5, L3-4, and L2-

3, and "moderate to severe right neural foraminal stenosis secondary to bulging disc material" at L4-5. *Id.*

Later in May, Plaintiff saw neurologist Deborah Blades, M.D. (Tr. 681-84). Plaintiff reported "low back pain which has resulted in significant disability." (Tr. 681). His pain "waxe[d] and wane[d] and [could] occur during activity or during rest." *Id.* He reported pain management had largely not helped. *Id.* Dr. Blades noted "[s]ome tenderness . . . along the right lumbar paraspinal muscles" and some right lumbar spasm, but normal gait, posture, and strength. (Tr. 683). Dr. Blades concluded that "[g]iven his low back pain which radiates into his hips and groin and his lumbar MRI is really unremarkable to explain his symptoms, I have recommended he undergo bone scan for further evaluation." (Tr. 684).

In June 2014, after an "unremarkable" bone scan, Dr. Blades referred Plaintiff to aquatic therapy. (Tr. 679). Plaintiff underwent physical therapy for lower back pain from June through August 2014. (Tr. 689-99). At his August 19, 2014 visit, Plaintiff reported an "overall 30-40% improvement since starting PT." (Tr. 689).

*Opinion Evidence*

*Consultative Examinations*

In April 2013, Plaintiff underwent a consultative examination with Kimberly Togliatti-Trickett, M.D., at the request of the state agency. (Tr. 352-59). Plaintiff reported "the limiting factor with returning to work is due to the back and shoulder pain." *Id.* Plaintiff reported he was not taking medication, had constant pain, and had tried physical therapy, medication, and injections. (Tr. 357).

On examination, Dr. Togliatti-Trickett found Plaintiff had a normal gait and "[n]ormal ambulation on heels and toes." (Tr. 358). He had "[m]ild tenderness with palpation over the lumbar

spine" and the range of motion of his lumbar spine was within functional limits "with minimal pain noted at the ends" of the range of motion. *Id.* His reflexes were "+2 in the upper extremities and difficult to illicit in the lower extremities." *Id.* His straight leg raising test was negative. *Id.* The impression was low back pain, shoulder strain, shoulder degenerative disc disease, and lumbar disc degeneration. *Id.* Dr. Togliatti-Trickett concluded Plaintiff could: (1) stand and walk for "at least 4-6 hours throughout the day; (2) sit with "no problem"; and (3) lift and carry "objects up to 40 pounds on occasion, without difficulty." *Id.* The doctor also noted Plaintiff was "limited by his subjective complaints of pain which outweigh his physical exam findings noted today." *Id.*

In January 2015, Plaintiff underwent a disability evaluation with Michael Harris, M.D. of the MetroHealth Medical Center Department of Physical Medicine and Rehabilitation at the referral of a physician. (Tr. 753-54). Dr. Harris noted Plaintiff was "well known to our department." (Tr. 753). He stated Plaintiff's "back pain [was] the main issue" and that the pain radiated into both legs. *Id.* Plaintiff was taking Naproxen, alternating with Diclofenac, and occasional Flexeril and Toradol. *Id.* Plaintiff also reported right shoulder pain. *Id.* Dr. Harris noted he took x-rays which revealed shoulder abduction. (Tr. 753-54). Plaintiff had full external rotation, but internal rotation was limited to 60 degrees. (Tr. 754). He had no instability but was "weak with resisted internal and external rotation as well as resisted abduction 4/5 in the right shoulder compared to the left side, which was normal." *Id.* On examination, Plaintiff's back was "tender over the L4-5 and L5-S1 interspace, and had "[m]ild tenderness . . . over the iliac crest bilaterally." *Id.* Plaintiff had normal strength, no wasting, and his sensory exam was normal. *Id.* Dr. Harris could not, however, elicit lower extremity reflexes. *Id.* Dr. Harris's impression was "chronic spondylogenic low back pain due to degenerative disk disease, [status post] L4-5 laminectomy, now with post-laminectomy syndrome" as well as "chronic [right] shoulder pain [status post right]

shoulder arthroplasty." *Id.* Dr. Harris opined Plaintiff could maximally lift "10 pounds close to his body" and "should not be doing any lifting from the floor". *Id.* He also opined Plaintiff "should avoid any reaching or overhead lifting with the right shoulder." *Id.* He could "sit for 1 hour intervals" for a maximum of four to six hours per day and could "stand for 15 minute intervals about 2-3 hours a day." *Id.*

*Physical Therapist RFC*

In February 2015, physical therapist W. Marcus Tagby, DMT, completed a "Lumbar Spine Residual Functional Capacity Questionnaire." (Tr. 756-80). Mr. Tagby noted Plaintiff had physical therapy twice per week from June 24, 2014 through August 19, 2014. (Tr. 756).[2] He noted positive objective signs of straight leg raising on the left, abnormal gait, muscle spasm, atrophy, and weakness. (Tr. 757). He opined Plaintiff's pain would frequently interfere with his attention and concentration to perform simple work tasks. *Id.* He thought Plaintiff could walk three to four city blocks without rest or severe pain. *Id.* Mr. Tagby opined Plaintiff could sit for fifteen minutes at a time, for two hours total in an eight-hour workday; and he could stand for fifteen minutes at a time before needing to shift positions, for two hours total in an eight-hour workday. (Tr. 757-58). He opined Plaintiff would need to take unscheduled breaks every one to two hours, and would need to shift positions at will. (Tr. 758). He also opined that with prolonged sitting, Plaintiff's legs should be elevated ("if possible"), for 25 percent of the workday. *Id.* He concluded Plaintiff could frequently lift less than ten pounds, occasionally lift up to twenty pounds, and never lift fifty pounds. (Tr. 759). He could: frequently twist; occasionally stoop or bend; rarely crouch or squat;

---

2. In response to the question of what was "the earliest date that the descriptions of symptoms and limitation in this question[n]aire applie[d]?", Mr. Tagby noted "date of evaluation 2/4/2015". *Id.*

never climb ladders; and rarely climb stairs. *Id.* He noted Plaintiff could not lift anything overhead greater than five pounds due to shoulder pain. *Id.*

*State Agency Reviewers*

In April 2013, Rannie Amiri, M.D., reviewed Plaintiff's records at the request of the state agency. (Tr. 69-71). He concluded Plaintiff could: (1) occasionally lift or carry 20 pounds; (2) frequently lift or carry 10 pounds; (3) stand, walk or sit about six hours in an eight hour work day; (4) occasionally climb ladders, ropes, or scaffolds; (5) occasionally crouch; and (6) frequently stoop or crawl. (Tr. 70).

In July 2013, state agency physician Abraham Mikalov, M.D., also reviewed Plaintiff's records. (Tr. 96-98). Dr. Mikalov reached the same conclusions as Dr. Amiri regarding lifting, carrying, sitting, standing, and walking. (Tr. 96-97) He offered slightly different postural limitations, finding Plaintiff could: (1) frequently climb ramps or stairs, kneel, or stoop; (2) occasionally crouch or crawl; and (3) never climb ladders, ropes, or scaffolds. (Tr. 97). He further opined Plaintiff should avoid all exposure to hazards, and avoid concentrated exposure to vibration. (Tr. 98).

## VE Testimony & ALJ Decision

### VE Testimony

A VE testified at the administrative hearing. (Tr. 54-62). Plaintiff's counsel stipulated to the VE's qualifications to testify. (Tr. 54). At the beginning of the questioning, the VE responded in the affirmative to the ALJ's question about whether he was familiar with the Social Security Administration's definitions of unskilled, semiskilled, skilled, sedentary, light, medium, heavy and very heavy work. (Tr. 55). The ALJ then asked: "Do you understand that if you give an opinion that conflicts with the information in the <u>Dictionary of Occupational Titles</u> or the <u>Selected</u>

Characteristics of Occupations, that you need to advise us of the conflict and the basis for your opinion?" *Id.* The VE responded: "I understand." *Id.* The VE stated he had reviewed Plaintiff's past employment and described that work:

> The county recorder, a recording clerk, is an occupational title as a statistical clerk in the <u>DOT</u>. The number is 216.382-062. SVP: 4, which is met by duration, semiskilled. Classified and shown in the record at sedentary. Collection clerk, in the DOT it can identify with the number 241.357-010. Classified at light, described here as performed sedentary, he said mostly in the office.

(Tr. 57).[3]

The ALJ then asked the VE to assume a hypothetical individual with the same age, education, and vocational background as Plaintiff. (Tr. 58). In her third hypothetical question (which ultimately corresponded with her adopted RFC), the ALJ asked the VE to assume such a person who "was limited to lifting ten pounds occasionally, less than that frequently"; "should not do any lifting from the floor"; "should avoid reaching or overhead lifting with the right upper extremity"; "can sit for one-hour intervals for six hours a day"; and "can stand for 15-minute intervals for three hours a day." (Tr. 60). Such individual could frequently use ramps or stairs; could not use ladders, ropes, or scaffolds; could frequently stoop or kneel; could occasionally crouch or crawl; and must avoid concentrated exposure to vibration and avoid all exposure to unprotected heights. *Id.* The VE testified that such an individual could perform Plaintiff's past work as a records clerk or collection clerk. *Id.*

The ALJ and Plaintiff's counsel asked additional questions. (Tr. 60-62). After his questioning, Plaintiff's counsel stated: "I have nothing additional, Judge." (Tr. 62).

---

3. The undersigned only quotes the VE's testimony on the two jobs at issue before the Court. The VE also summarized several other past jobs. *See* Tr. 57.

*ALJ Decision*

The ALJ found Plaintiff met the insured status requirements for DIB through March 31, 2017, and had not engaged in substantial gainful activity since September 11, 2012, his alleged onset date. (Tr. 19). He concluded Plaintiff had severe impairments of degenerative disc disease of the L4-L5 disc space with post-laminectomy syndrome, and residual surgical effects from degenerative joint disease of the right shoulder status-post arthroplasty. *Id.* The ALJ found that these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 21). The ALJ then found Plaintiff retained the residual functional capacity:

> to perform a reduced range of sedentary work with the following additional limitations . . . He can lift a maximum weight of 10 pounds in a manner close to the body. He cannot lift from the ground floor. He is precluded from reaching or overhead lifting with the right shoulder. He can sit for an hour at a time for six hours a day. He can stand for fifteen-minute intervals about two to three hours a day. He is limited to frequently climbing ramps and stairs. He cannot climb ladders, ropes, or scaffolds. He can frequently stoop and kneel. He can occasionally crouch and crawl. He must avoid concentrated exposure to vibration. He must avoid all exposure to unprotected heights.

(Tr. 23-24). The ALJ then concluded Plaintiff was "capable of performing past relevant work as a county recording clerk (i.e., statistical clerk) as generally performed and actually performed and as a collection clerk as actually performed but not [as] generally classified." (Tr. 25); *see also* Tr. 27 ("In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform his past relevant work as County Recording Clerk and as Collection Clerk to the extent described in this finding."). Because Plaintiff could perform past work, the ALJ concluded Plaintiff was not disabled. (Tr. 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

13

4.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents two arguments: 1) the ALJ erred in relying on VE testimony to find Plaintiff could perform past work; and 2) a sentence six remand is required for the consideration of new and material evidence. (Doc. 14). The Commissioner responds that the ALJ did not err in relying on the VE testimony, and no sentence six remand is required. (Doc. 18).

### *Step Four & VE Testimony*

Plaintiff first argues the ALJ erred by failing to resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT") definitions, as required by Social Security Ruling ("SSR") 00-4p. (Doc. 14, at 7-11). The Commissioner responds that the ALJ complied with SSR 00-4p. (Doc. 18, at 9-12). For the reasons discussed below, the undersigned agrees with the Commissioner.

At step four—in determining whether a plaintiff is able to perform past relevant work—an ALJ may solicit testimony from a VE. *See* 20 C.F.R. § 404.1560(b)(2) ("We may use the services

of vocational experts . . . to help us determine whether you can do your past relevant work[.]");

*Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("The regulations permit the ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work, given his RFC."). The ALJ must make a finding "supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation and citation omitted). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on the VE's testimony in response to a hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010).

One of the most common tools utilized by VEs during testimony is the DOT, which is a list of "maximum requirements of occupations as generally performed," however a VE "may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p, 2000 WL 1898704, at *2. Indeed, a VE has the ability to craft his answer in response to an individualized hypothetical RFC with potential limitations unforeseen by the DOT. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("[An] ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity.'"). "[N]either the DOT nor [the expert's testimony] automatically trumps when there is a conflict." SSR 00-4p, 2000 WL 1898704, at *2.

The ALJ has an affirmative responsibility to "inquire, on the record, as to whether or not there is [] inconsistency" between the VE's testimony and the DOT." *Id.* Beyond this initial inquiry, however, the ALJ is under no obligation to further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the [ALJ]."

*Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009); *see also Beinlich*, 345 F. App'x at 168.

First, here, the ALJ specifically asked the VE—at the beginning of his testimony "Do you understand that if you give an opinion that conflicts with the information in the <u>Dictionary of Occupational Titles</u> or the <u>Selected Characteristics of Occupations</u>, that you need to advise us of the conflict and the basis for your opinion?" (Tr. 55). The VE responded: "I understand." *Id.* This is sufficient to satisfy the inquiry requirement, and it does not matter that the inquiry happened *before* rather than *after* the VE's substantive testimony. *See Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) ("The text of [SSR 00-4p] only requires ALJs to inquire about conflicts 'before *relying*' on a VE's testimony, but does not specify whether this inquiry should (or must) occur before or after a VE testifies.") (quoting SSR 00-4p) (emphasis in original); *see also Baker v. Comm'r of Soc. Sec.*, 2012 WL 2309063, at *4 (E.D. Mich.) (relying on *Weatherbee* and reaching the same conclusion).

Second, counsel here was offered the opportunity to cross-examine the VE, and did so, without asking any questions about a conflict between the VE's testimony and the DOT. *See* Tr. 61-62. As prior Sixth Circuit cases have held,

> [T]he ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p . . . This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief. *See Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008).

*Beinlich*, 345 F. App'x at 168-69 ("Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision."); *see also Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing in S.S.R. 00-4p places an

affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct. . . . Because [Plaintiff] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict [between the VE's testimony and the DOT] was resolved."). Here, at the end of his questioning of the VE, Plaintiff's counsel stated he "ha[d] nothing additional." (Tr. 62). Thus, the ALJ did not err in not addressing a potential conflict that was not brought to his attention. *Beinlich*, 345 F. App'x at 168-69; *Martin*, 170 F. App'x at 374.

Finally, as the Commissioner points out, the ALJ found Plaintiff could perform some of his past relevant work "as actually performed." *See* Tr. 27 (finding Plaintiff was capable of performing "past work as a County Recording Clerk (i.e., statistical clerk) [as] generally performed *and actually performed* and Collection Clerk *as actually performed* but not as generally performed.") (emphasis added). Because the VE found Plaintiff could perform this work as *actually* performed, rather than merely as *generally* performed (and thus as defined in the DOT), any error in relying on the DOT is harmless. This is so because the DOT is a list of "maximum requirements of occupations as *generally* performed." SSR 00-4p, 2000 WL 1898704, at *2. A VE "may be able to provide more specific information about jobs or occupations than the DOT." *Id.* Here, because the VE found that Plaintiff could perform his past work as *actually* performed, any conflict with the DOT regarding how the job is generally performed is irrelevant.[4] *See Kyle v.*

_____

4. Furthermore (although the undersigned need not reach the conflict question due to the above), the alleged conflict Plaintiff points to is that "the records clerk position requires constant reaching" and "the collection clerk position requires occasional reaching . . .which . . . is inconsistent with the ALJ's hypothetical question imposing no reaching with the right upper extremity." (Doc. 14, at 9). As the Commissioner correctly points out, the DOT descriptions are "silent on whether an individual needed to reach with *both* hands in order to perform the job as generally performed." (Doc. 18, at 11). *See, e.g., Lessley v. Colvin*, 2015 WL 10710837, at *5 (D. Nev.) (holding that "[g]iven Plaintiff's full use of her left arm, the undersigned concludes that there is no conflict between the VE's testimony and the DOT" regarding reaching, and citing other district court cases

*Comm'r of Social Security,* 609 F.3d 847, 853, n. 9 (6th Cir.2010) ("The type of conflict [SSR 00–4p] anticipates is not between the type of job claimant performed in the past and that which the VE opines [her] skills can transfer to in the future, but a conflict between the type of jobs the claimant has been determined by [a] VE to be able to perform and the DOT job description of the capabilities and skills required to do the job."); *see also Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir. 2003) ("[W]e know of no circuits that have found a 'conflict' in a discrepancy between, on the one hand, the expert's description of the job that the claimant actually performed, and the Dictionary's description of the job as it is performed in the national economy."). The VE listened to Plaintiff's description of his prior jobs (Tr. 39-43), and the hypothetical question posed by the ALJ (Tr. 60), and testified that Plaintiff could perform past work. The undersigned finds no error here.

### Sentence Six Remand

Second, Plaintiff argues remand is appropriate to consider additional evidence regarding his back and shoulder impairments. (Doc. 14, at 11-12). Specifically, Plaintiff points to a June 2015 visit with James Anderson, M.D., a July 2015 lumbar spine MRI, and an October 2015 shoulder examination. (Tr. 856-84). The Commissioner responds that Plaintiff has not shown the evidence is "material", nor has he shown "good cause" for failure to present it earlier. (Doc. 18, at 12-15). For the reasons discussed below, the undersigned agrees with the Commissioner.

Plaintiff submitted additional evidence to the Appeals Council. *See* Tr. 856-84 (records dated June 26, 2015 through July 24, 2015, from James Anderson, M.D., and records dated October

---

holding similarly); *Byers v. Colvin*, 2017 WL 1251079, at *5 (E.D. Tex.) ("Many courts presented with this exact issue . . . have refused to discern a conflict between the requirement of frequent reaching and a vocational expert's testimony that a person restricted in one extremity could perform the job.") (citing other district court cases).

28, 2015 through November 25, 2015, from the Cleveland Clinic). The Appeals Council considered the information, but denied review. (Tr. 2). The Appeals Council's denial of review is not subject to judicial review, and the ALJ's decision is the final decision of the Commissioner for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 682, 696 (6th Cir. 1993); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

The Court, however, has independent jurisdiction under "sentence six" of Section 405(g) to remand for consideration of additional evidence. A remand pursuant to sentence six is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 276 (6th Cir. 2010); 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence be taken . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."). Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Ferguson*, 628 F.3d at 276. "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001). This standard also applies to evidence submitted for the first time to the Appeals Council. *Id*.; *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996). The burden is on Plaintiff to show the evidence is new, material, and there is good cause for failure to submit earlier. *See Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

The evidence presented is new, in that it post-dates the ALJ's opinion. *See Ferguson*, 628 F.3d at 276. However, Plaintiff has not shown that the evidence is "material", nor has he shown

"good cause" for failure to present it earlier. Plaintiff points to the July 2015 lumbar spine MRI, which, he alleges "revealed a worsening of Plaintiff's condition". (Doc. 14, at 12). Plaintiff has not, however, explained precisely how the July 2015 MRI differs from the May 2014 MRI (Tr. 685, 860), and how that demonstrates a "reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with this evidence." *Foster*, 279 F.3d at 358. The 2014 and 2015 MRIs both show changes due to Plaintiff's laminectomy, and degenerative changes. *See* Tr. 685, 860. Both also show right neural foraminal stenosis at L4-5, with the 2014 MRI characterizing this as "moderate to severe" and the 2015 MRI characterizing it as "severe". *Id.* The 2015 MRI also found "[m]oderate left foraminal stenosis" at L5-S1. (Tr. 860). The 2015 MRI does not contain a comparison to the 2014 MRI, and the two studies were performed at different facilities and interpreted by different radiologists. (Tr. 685, 860). Dr. Anderson, in interpreting the 2015 MRI stated that "[t]he MRI shows that there is some scarring around the surgical site. But I do not see any nerve root compression" and said he would order an EMG of the left lower extremity. (Tr. 857). He also noted that "[c]urrently I do not see anything that I would recommend surgery for . . . [though] I would be willing to look further if the EMG shows signs of radiculopathy." *Id.*[5] Notably, Dr. Anderson had seen Plaintiff's May 2014 MRI at a visit prior to his June 2015 MRI. (Tr. 862) ("The patient brought in his MRI from May 2014 of the lumbar spine."). And there is nothing in his notes—or in Plaintiff's argument—to indicate that the changes between the two were clinically significant and resulted in a change in Plaintiff's functional capacity.

Moreover, even assuming Plaintiff has shown the new evidence regarding his back was material, he has not shown "good cause." The Sixth Circuit has taken a "harder line on the good

---

5. The results of the EMG study were not submitted either to the Appeals Council or this Court.

cause test." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). This requires more than just showing evidence did not exist at the time of the ALJ's decision, but rather a Plaintiff must "give a valid reason for his failure to obtain evidence prior to the hearing." *Id.* Plaintiff offers no specific "good cause" argument, but states "Dr. Anderson . . . ordered a new MRI in light of Plaintiff's increase in low back pain with radiation to the lower extremity and weakness" and that "[t]his evidence documents treatment obtained shortly after the ALJ hearing and is therefore new and could not have been submitted prior to the ALJ decision." (Doc. 14, at 11-12). This is not sufficient to satisfy the good cause requirement.[6] Plaintiff has not explained why, if he believed his condition had changed, he did not seek a follow-up MRI prior to the hearing. *See Oliver*, 804 F. 2d at 966 (finding Plaintiff had not provided a valid reason for not obtaining certain testing "prior to the hearing" and "[t]herefore, the good cause requirement [was] not met.").

Plaintiff has similarly not shown that the evidence relating to his shoulder is "material". "It is well established that a Sentence Six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing." *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio 2011) (citing *Wyatt*, 974 F.2d at 685); *see also Sizemore*, 865 F.2d at 712 ("Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began."). At the October 2015 visit, Plaintiff reported "[h]e started having pain in the right shoulder again about 2-3 months ago and was seen and sent for physical therapy". (Tr. 866). Three months before

---

6. Additionally, Plaintiff's phrasing suggests that this was a deterioration in condition ("in light of Plaintiff's increase in low back pain"). *See* Doc. 14, at 11. As noted below, evidence of a worsening of one's condition after an ALJ's decision is not material. *See, e.g.*, *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial.")

October 2015 is July 2015, which is *after* the ALJ's decision. Thus, the shoulder evidence is not "material" as it does not relate to the time period considered by the ALJ. *See Wyatt*, 974 F.2d at 685 ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."); *Walton*, 773 F. Supp. 2d at 753.

If Plaintiff alleges a worsening of his condition, the proper course of action is to file a new application for benefits, not a sentence six remand. *See Sizemore*, 865 F.2d at 712 ("If in fact the claimant's condition had seriously degenerated, the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment."). The undersigned concludes Plaintiff has not shown a sentence six remand is appropriate here.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision supported by substantial evidence, and therefore affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge